Rodney HALL, Appellant,

Heckathorn Farms, Inc., Richard McBrayer, Ray Strunk, James Adamson, Alan Haag, Appellants,

v.

Richard E. LYNG, in his official capacity as Secretary of the United States Department of Agriculture; the United States Department of Agriculture, an agency of the United States Government, Appellees.

No. 86–5164.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 9, 1986.

Decided Aug. 24, 1987.

Jeff Masten, Canton, S.D., for appellant.

Jeffrey Clair, Washington, D.C., for appellees.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and CONMY,[*] District Judge.

BRIGHT, Senior Circuit Judge.

Rodney Hall and four other South Dakota farmers appeal from the district court's grant of summary judgment in favor of the defendant Richard E. Lyng, Secretary of the United States Department of Agriculture. The farmers seek mandatory disaster payments for their feed grain and wheat crops as provided in the Agriculture and Food Act of 1981 (1981 Agriculture Act), 7 U.S.C. § 1444d(b)(2) (1982) (feed

grain) and 7 U.S.C. § 1445b–1(b)(2) (1982) (wheat), *amended by* Food Security Act of 1985, Pub.L. No. 99–198, §§ 308 (wheat), 401 (feed grain), 99 Stat. 1354, 1387, 1399 (1985). For the reasons discussed below, we reverse and remand for the district court to enter declaratory relief in favor of the appellant farmers.

## I. BACKGROUND

### A. Proceedings Below

As a result of exceptionally heavy snows and excessive spring rains in 1983–84, farmers in southeastern South Dakota were unable to plant over one million acres of farmland. Twenty-three counties were declared a disaster area by the President of the United States and the Farmers Home Administration. Thirty-one thousand farmers were affected by the floods. Although the Secretary of Agriculture provided emergency loans and feed at reduced prices, he refused to make mandatory disaster payments for the farmers' unplanted feed grain and wheat crops pursuant to the 1981 Agriculture Act. The Secretary also refused to implement discretionary disaster payments for these crops pursuant to sections 1444d(b)(2)(D) and 1445b–1(b)(2)(D).

Five farmers subsequently filed suit in the United States District Court for the District of South Dakota seeking declaratory relief and a writ of mandamus to compel the Secretary to implement the mandatory and discretionary payments. The district court granted summary judgment in favor of the Secretary, finding that the Secretary's interpretation of the mandatory disaster payments provisions provided in sections 1444d(b)(2) and 1445b–1(b)(2) was not unreasonable. Accordingly, the court held that the Secretary was not required to make the mandatory disaster payments. With respect to the discretionary payments, the court dismissed the claim without prejudice to the farmers' ability to re-file after the Secretary promulgates regulations to implement these payments as

---

[*] The HONORABLE PATRICK A. CONMY, Chief United States District Judge for the District of North Dakota, sitting by designation.

required by *Iowa ex rel. Miller v. Block,* 771 F.2d 347, 352 (8th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 3312, 92 L.Ed.2d 725 (1986).[1]

### B. The Disaster Payments Program

In 1981, Congress reauthorized the Special Disaster Payments Program (SDPP) for wheat and feed grain crops for the 1982 to 1985 crop years under the 1981 Agriculture Act.[2] In subsection (A) of the relevant provisions, the statute states that the Secretary of Agriculture "shall" make payments to "producers on a farm" who are either "prevented from planting any portion of the acreage intended" for wheat or feed grain or who are unable to harvest a full crop of wheat or feed grain "because of drought, flood, or other natural disaster." Subsection (C) restricts eligibility for mandatory disaster payments to those farmers for whom crop insurance is not "available" under the Federal Crop Insurance Act "with respect to their feed grain [or wheat] acreage." Finally, in subsection (D), the Secretary is allowed to make discretionary disaster payments to farmers for the loss or inability to plant a crop due to "drought, flood, or other natural disaster."

The Federal Crop Insurance Act, 7 U.S.C. §§ 1501–1520 (1982), referred to in subsection (C) of the mandatory disaster payments provisions, authorized the federal

---

1. In *Miller,* the state of Iowa and several individual farmers sought review of the Secretary's refusal to implement several discretionary federal disaster relief programs, including the discretionary provisions of the special disaster payment program for agricultural crops, the mandatory provisions of which are at issue in this case. 771 F.2d at 349. In holding that the three statutory criteria for determining eligibility for the discretionary payments constituted "law" to apply in reviewing the Secretary's failure to promulgate eligibility guidelines, this Court stated in dicta that "when Congress has created a program which contemplates that such payments will be made in appropriate circumstances, it is the clear duty of the Secretary to promulgate regulations which carry out the intent of Congress." *Id.* at 352. The Court in *Miller* did not reach the merits, however, as it held that the state of Iowa lacked standing to pursue the litigation.

2. The relevant provisions of the SDPP under the 1981 Agriculture Act read as follows:

(A) Except as provided in subparagraph (C) of this paragraph, if the Secretary determines that the producers on a farm are prevented from planting any portion of the acreage intended for feed grains to feed grains or other nonconserving crops because of drought, flood, or other natural disaster, or other condition beyond the control of the producers, the Secretary shall make a prevented planting disaster payment to the producers on the number of acres so affected * * * .

    *    *    *    *    *    *

(C) Producers on a farm shall not be eligible for disaster payments under this paragraph if crop insurance is available to them under the Federal Crop Insurance Act [7 U.S.C. 1501 et seq.] with respect to their feed grain acreage. (D) Notwithstanding the provisions of subparagraph (C) of this paragraph, the Secretary may make disaster payments to producers on a farm under this paragraph whenever the Secretary determines that—

(i) as the result of drought, flood, or other natural disaster, or other condition beyond the control of the producers, producers on a farm have suffered substantial losses of production either from being prevented from planting feed grain or other nonconserving crop or from reduced yields, and that such losses have created an economic emergency for the producers;

(ii) Federal crop insurance indemnity payments and other forms of assistance made available by the Federal Government to such producers for such losses are insufficient to alleviate such economic emergency, or no crop insurance covered the loss because of transitional problems attendant to the Federal crop insurance program; and

(iii) additional assistance must be made available to such producers to alleviate the economic emergency.

7 U.S.C. § 1444d(b)(2). The relevant provisions for wheat are identical to those for feed grains. 7 U.S.C. § 1445b–1(b)(2).

Subsection (C) of sections 1444d(b)(2) and 1445b–1(b)(2) was amended in 1985 in a manner that conforms with the farmers' interpretation of the meaning of subsection (C) under the 1981 Agriculture Act. The 1985 version of subsection (C) provides that,

(C) Producers on a farm shall not be eligible for—

(i) prevented planting disaster payments under subparagraph (A), if prevented planting crop insurance is available to the producers under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.) with respect to the feed grain acreage of the producers; * * * .

Food Security Act of 1985, Pub.L. No. 99–198, § 401 (feed grain), 99 Stat. 1354, 1387, 1399 (1985). The relevant provisions for wheat are identical to those for feed grains. § 308, Food Security Act of 1985.

government's sale of subsidized "all-risk" insurance covering the loss of a crop to an unavoidable cause such as drought, flood, hail, frost, lightning, fire, insects, or disease. The 1980 amendments to the Act improved the prior existing crop insurance program by providing for the sale of "all-risk" crop insurance in all agricultural counties nationwide and for the expansion of the "all-risk" insurance to cover all important agricultural commodities. H.R. Rep. No. 430, 96th Cong., 2d Sess. 10 (1979). The "all-risk" crop insurance offered by the government provides coverage only for the loss of an already planted crop; it does not provide coverage for losses when a farmer is prevented from planting a crop. The Federal Crop Insurance Act provides that the "all-risk" insurance "shall be against loss of the *insured commodity* * * * ." 7 U.S.C. § 1508(a) (emphasis added). Moreover, regulations governing the crop insurance program stipulate that all-risk crop insurance shall not "attach" to a farmer's acreage unless the acreage is planted by a date set for that county by the Federal Crop Insurance Corporation. 7 C.F.R. § 401.111 (1985). Although the 1980 Act authorized the sale of "specific risk" insurance, that included coverage for losses due to a farmer's inability to plant a crop, 7 U.S.C. § 1508(g), such insurance was exclusively offered under a pilot program designed to obtain actuarial data. *See* 7 U.S.C. § 1508(i); 7 C.F.R. § 442 (1984). In 1984, "specific risk" insurance was sold in only ten counties across the nation, none of which were located in South Dakota. 7 C.F.R. app. § 442 (1984).

## II. DISCUSSION

### A. Issue Presented

We are confronted in this case with a narrow and specific question of statutory construction. As noted above, subsection (C) of sections 1444d(b)(2) and 1445b-1(b)(2) of the 1981 Agriculture Act provides that farmers shall not be eligible for mandatory disaster payments if "crop insurance is available to them under the Federal Crop Insurance Act with respect to their feed grain [or wheat] acreage" (citation omit-

ted). We are asked to decide whether this statutory language renders those South Dakota farmers who were prevented by spring floods from planting their 1984 wheat and feed grain crops ineligible for mandatory disaster payments because "all-risk" crop insurance was offered for sale during that same year throughout the state of South Dakota. To answer this, we must first determine the proper interpretation of the term "available" in subsection (C) of sections 1444d(b)(2) and 1445b-1(b)(2).

In essence, the Secretary interprets the term "available" to mean the offering for sale of any type of crop insurance in the farmers' home county, regardless of whether the insurance offered covered the farmers' losses. The Secretary maintains that because the government offered some type of crop insurance to the appellant South Dakota farmers who experienced prevented planting losses in 1984, crop insurance was "available" to them under the meaning of subsection (C) of sections 1444d(b)(2) and 1445b-1(b)(2), even though that insurance, "all-risk" crop insurance, did not cover appellants' losses resulting from their inability to plant their crops due to a natural disaster. The Secretary thus concludes that the appellant farmers are ineligible for the mandatory disaster payments provided to farmers suffering prevented planting losses under subsection (A) of sections 1444d(b)(2) and 1445b-1(b)(2).

The farmers interpret the term "available" more narrowly to mean the government's offer for sale in the farmers' home county of a type of crop insurance that actually covered the risk causing their losses. Specifically, the farmers assert that because the crop insurance offered for sale in South Dakota in 1984—"all-risk" crop insurance—did not cover the risk of a natural disaster preventing them from planting their crops, crop insurance was not "available" to them under the meaning of subsection (C) of sections 1444d(b)(2) and 1445b-1(b)(2). The farmers recognize that "specific risk insurance", which would have covered their losses, was authorized by Congress in the 1980 amendments to the Federal Crop Insurance Act. They argue, however, that because this type of insur-

ance was not offered for sale in any South Dakota county in 1984, it was also not "available" to them under the meaning of subsection (C). Accordingly, the farmers argue that, because no crop insurance was "available" to them, they are eligible for the mandatory disaster payments provided for prevented planting losses under subsection (A) of sections 1444d(b)(2) and 1445b–1(b)(2).

We conclude, after careful study, that the Secretary's interpretation is not consistent with either the language or the legislative history of the 1981 Agriculture Act.

### B. Eligibility for Mandatory Disaster Payments for Prevented Planting Losses

■ First, and of foremost importance to our conclusion, we believe that the Secretary's interpretation of the term "available" in subsection (C) of sections 1444d(b)(2) and 1445b–1(b)(2) misconstrues Congress' primary purpose in conditioning the disbursement of mandatory disaster payments upon a farmer's inability to obtain crop insurance under the Federal Crop Insurance Act. This purpose was to encourage as many farmers as possible to buy "all-risk" crop insurance. Although Congress proceeded to phase out the disaster payments program to encourage the purchase of this crop insurance, the 1981 Agriculture Act's legislative history shows that Congress did not intend to terminate disaster payments where it would not encourage crop insurance purchases, or to end federal relief for losses due to preplanting disasters. The "all-risk" crop insurance covered crops. The government never offered these farmers a form of insurance that applied to no crop, that is, where no crop could be planted because of a preplanting disaster. It follows, therefore, that Congress did not intend to make ineligible for mandatory disaster payments those farmers experiencing prevented

3. The issue in this case is in no way related to planted crop losses which might not be covered

planting losses with access only to "all-risk" crop insurance.[3]

In the 1980 amendments to the Federal Crop Insurance Act, Congress authorized the sale of subsidized "all-risk" crop insurance in all agricultural counties and for all important agricultural commodities. In offering more comprehensive insurance to more farmers, Congress hoped to reduce its expenditures for mandatory disaster payments. H.R.Rep. No. 430, 96th Cong., 2d Sess. 11 (1979). The success of the expanded crop insurance program depended, however, upon a greater degree of farmer participation in the program than the program had previously received. *Id.* To increase participation levels, Congress decided to withdraw what it concluded was a major disincentive to farmers' purchase of "all-risk" crop insurance—free mandatory disaster payments. *Id.* That Congress' purpose in phasing out the mandatory disaster payments program was solely to achieve such an end is demonstrated by the Report of the Senate Agriculture, Nutrition and Forestry Committee on the 1981 Agriculture Act. The Report states,

> The continuation of the disaster payments program without change, as some parties advocate, would detract from the number of farmers who otherwise would purchase Federal all-risk crop insurance. Participation levels among wheat and upland cotton producers, particularly, would remain low, and premiums would climb inasmuch as the risk of loss could not be spread among a sufficiently broad-based body of participants.

S.Rep. No. 126, 97th Cong., 1st Sess. 76 (1981), U.S.Code Cong. & Admin.News 1981, pp. 1965, 2041. Earlier, in the Report of the House Agricultural Committee on the Federal Crop Insurance Act of 1980, Congress similarly stated that survival of the new crop insurance program depended upon greater participation in the federal crop insurance program, which, in turn, demanded the imposition of new restrictions on the eligibility for mandatory disaster payments. This Report states,

by the "all-risk" crop insurance offered.

Many farmers have not participated in the Federal crop insurance program in the past because they were aware of other Federal assistance programs which are free. Of primary importance are the disaster payments program on six major commodities. * * * However, in 1981, the first year of operation of the new insurance program, the disaster payments would not be available in a county on a crop where the new program has been implemented. This phaseout of the disaster assistance program is considered necessary for the proper functioning and acceptance of the new Federal crop insurance program.

H.Rep. No. 430, 96th Cong., 2d Sess. 13 (1979).

■ In view of these expressions of congressional purpose, the scope of Congress' phase-out of the disaster payments program must be tailored to Congress' specific goal of increasing participation in the crop insurance program. Accordingly, it would not be within that intent for Congress to phase out mandatory disaster payments for preplanting disasters. Although rendering farmers ineligible for such payments for losses due to post-planting natural disasters would encourage purchase of the "all-risk" crop insurance covering this risk, rendering farmers ineligible for such payments for losses due to preplanting disasters would not encourage purchase of the "all-risk" crop insurance for the simple reason that "all-risk" crop insurance neither covers this risk nor can be obtained for a crop prior to planting. *See* 7 U.S.C. § 1508; 7 C.F.R. § 401.111 (1985). Thus considering Congress' purpose in inserting subsection (C) in the mandatory disaster

payments provisions, it cannot be logically maintained that Congress intended to disqualify farmers subject to preplanting disasters from mandatory disaster payments along with farmers subject to disasters subsequent to planting, even though both groups might have access to "all-risk" crop insurance.

■ Second, there is no indication, in either the language or legislative history of the 1981 Agriculture Act, that in requiring greater reliance on the crop insurance program as a means of disaster assistance, Congress intended the result of the Secretary's interpretation—to stop providing assistance for prevented planting losses. Such an intent would be contrary to Congress' consistent reauthorization of mandatory disaster payments for prevented planting losses for the last decade. Mandatory disaster payments for preplanting disasters were first authorized for crop years 1971 through 1977 by the Agriculture and Consumer Protection Act of 1973.[4] Congress reauthorized these payments for the 1978 and 1979 crop years in the Food and Agriculture Act of 1977.[5] The Federal Crop Insurance Act of 1980 authorized disaster payments for prevented planting losses for 1981,[6] and the 1981 Agriculture Act did the same for crop years 1982 through 1985.[7] Contrary to expressing an intent to abandon this record of assistance for losses traditionally covered by mandatory disaster payments, in the 1981 Agriculture Act's legislative history, Congress emphasized the crop insurance program's capacity to provide greater disaster assistance than the mandatory disaster payments program.[8]

---

**4.** Pub.L. No. 93–86, 87 Stat. 221 (1973) (1973 Agriculture Act). Section 8 of the 1973 Agriculture Act provided that "[i]f the Secretary determines that *the producers are prevented from planting,* any portion of the farm acreage allotment to wheat or other nonconserving crop, because of drought, flood or other natural disaster," the Secretary was to pay the producer an amount based upon the crop's price per bushel. The provisions for mandatory disaster payments in subsequent Agriculture acts differed from the 1973 Agriculture Act only in the formula used to determine the amount of the payments.

**5.** Pub.L. No. 95–113, § 401 (wheat), § 501 (feed grains), 91 Stat. 913 (1977).

**6.** Federal Crop Insurance Act of 1980, Pub.L. No. 96–365, § 201, 94 Stat. 1312, 1320 (1980).

**7.** 7 U.S.C. §§ 1444d(b)(2)(A), 1445b–1(b)(2)(A).

**8.** The Senate Report stated that the mandatory disaster payments program was inherently unfair in that only producers of certain crops were eligible for the payments. S.Rep. No. 126, 97th Cong., 1st Sess. 75 (1981), U.S.Code Cong. &

■ Third, depending upon how widely "all-risk" crop insurance is offered for sale, the Secretary's interpretation either yields an inequitable distribution of mandatory disaster payments among farmers experiencing prevented planting losses, or renders the statutory provision providing for such payments surplusage. During the time of the 1981 Agriculture Act's validity when "all-risk" crop insurance was not offered for sale in all agricultural counties for all important agricultural commodities,[9] under the Secretary's interpretation, farmers' eligibility for mandatory disaster payments depended solely upon whether the insurance was offered for sale in their particular county. This is because those farmers living in counties where crop insurance is available would not qualify for disaster payments, but farmers in counties where said crop insurance is unavailable could collect mandatory disaster payments. We do not believe such an intent should be attributed to Congress under the statute here in question.

Finally, the Secretary's interpretation of "available" was expressly rejected by Congress prior to enactment of the 1981 Agriculture Act. Prior to Conference, the House amended the Senate Bill to add language similar to the Secretary's interpretation. As explained by the Conference Committee, "The *House* amendment makes disaster payments available to [wheat and feed grain] producers of the 1982 through 1985 crops in any county in which Federal subsidized crop insurance is not generally offered for that crop prior to planting."

H.R.Conf.Rep. No. 97–377, 97th Cong., 1st Sess. 159 (wheat), 164 (feed grain) (1981). That language, not included in the legislation, would track the Secretary's present interpretation—that a farmer is not eligible for disaster payments if crop insurance is *generally* available in his county, regardless of whether that insurance covers the risk that caused his crop losses. This House amendment, the Conference Report states, was rejected in favor of the language found in the enacted legislation. *Id.* The Conference's rejection of a provision parroting the Secretary's interpretation is good evidence that the Secretary's interpretation was contrary to Congress' intent.

## C. Discretionary Disaster Payments

■ The Secretary argues that the applicability of the discretionary payments provision to prevented planting losses establishes that Congress did not intend for farmers to be eligible for mandatory disaster payments for the same losses. Our review of the statute convinces us, however, that the farmers' eligibility for discretionary disaster payments has no bearing upon their eligibility for mandatory disaster payments. First, the plain language of the statute provides that the farmers are eligible for discretionary payments over and above the mandatory disaster payments. The discretionary payments provision for both wheat and feed grain crops begins, "Notwithstanding the provisions of subparagraph (C) of this paragraph [the mandatory disaster payments provision], the Secretary may make disaster payments

---

Admin.News 1981, p. 2040. The Senate Report also stated that "[t]he issue * * * is not whether the Federal Government should provide disaster assistance to farmers. The issue is how the Federal Government should make such assistance available." *Id.*

9. Although Congress authorized the sale of "all-risk" crop insurance to all agricultural counties nationwide in 1981, "all-risk" insurance would not, as Congress was aware, actually be offered for sale in all counties for several years. Congress, when preparing the legislation, understood that such widespread sale of crop insurance would depend upon adequate congressional appropriations. As stated by the Senate Committee on Agriculture, Nutrition, and Forestry, "[i]f Congress supports this shared-cost crop in-

surance program with sufficient appropriations and if the Administration is able to facilitate a smooth transition to nationwide, all-crop, all-risk coverage, the farmers of this country will be able to purchase adequate protection from the ravages of natural disaster." S.Rep. No. 126, 97th Cong., 2d Sess. 76 (1981), U.S.Code Cong. & Admin.News, p. 2041. According to the Department of Agriculture, the "all-risk" crop insurance, offered prior to 1980 in approximately 1600 counties, would be offered in 250 additional counties a year until 1985, at which time it was expected "all-risk" crop insurance would be offered in every agricultural county nationwide. U.S. Dept. of Agriculture, Federal Crop Insurance Corporation, *The New All-Risk Crop Insurance Program ... The Farmer's Silent Partner,* 5–6 (1980).

* * *." 7 U.S.C. §§ 1444d(b)(2)(D), 1445b–1(b)(2)(D). Had Congress intended to disqualify those farmers eligible for mandatory disaster payments from receiving discretionary payments, it is unlikely it would have employed the term "notwithstanding".

Second, the statute appears to permit the Secretary to make discretionary payments in addition to a primary source of aid such as mandatory disaster payments or crop insurance. Subsection (D)(i) of sections 1444d(b)(2) and 1445b–1(b)(2) authorizes such payments where a natural disaster has caused prevented planting losses or reduced yields amounting to an "economic emergency". Subsection (D)(ii) authorizes such payments where "no crop insurance covered the loss because of transitional problems attendant to the federal crop insurance program". Finally, subsection (D)(iii) authorizes discretionary payments in all cases of an economic emergency. Whether or not these instances cover prevented planting losses, it is apparent that the discretionary payments may be made in addition to sources of different primary assistance. Thus the farmers' eligibility for such discretionary disaster payments should not render them ineligible for mandatory disaster payments.

### D. Deference Owed the Secretary

■ It is because the Secretary's interpretation is contrary to the language, purpose, and legislative history of the Agriculture and Food Act of 1981 that we hold it to be unreasonable. We recognize that in upholding the Secretary's interpretation, the district court accorded his interpretation "substantial deference", both because the Secretary is charged with the administration and execution of the 1981 Agriculture Act and because the statute is "untried and new". *Hall v. Block*, slip op. at 4 (D.S.D. April 10, 1986) (citing *South Dakota v. Civil Aeronautics Board*, 740 F.2d 619, 621 (8th Cir.1984)).

Although the statute is indeed "untried and new", such extreme deference is not warranted in this case. Here the Secretary is interpreting Congress' intent, an exercise

the Supreme Court has labelled a "quintessential judicial function." *Bureau of Alcohol, Tobacco and Firearms (BATF) v. Federal Labor Relations Auth.*, 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 444, n. 8, 78 L.Ed.2d 195 (1983). In such a case, the Court has stated that "the agency's interpretation, particularly to the extent it rests on factual premises within its expertise, may be influential, but it cannot bind a court." *Id.* (citing *General Electric Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976); *Zuber v. Allen*, 396 U.S. 168, 192–93, 90 S.Ct. 314, 327–28, 24 L.Ed.2d 345 (1969)). Here there are no factual issues to be resolved; the matter is strictly legal. Thus this is not a case where agency expertise or agency interpretation need be accorded substantial deference. *See Sebben v. Brock*, 815 F.2d 475 (8th Cir.1987). Furthermore, the Secretary's interpretation is itself "untried and new" and has not survived the test of time that would warrant great deference. *See* K. Davis, 5 *Administrative Law* § 29.16 (2d ed. 1984) (deference "particularly" appropriate to consistent interpretations over a long period).

Reviewing courts cannot, in any case, be bound by a statutory interpretation they believe to be an aberration of Congress' intent. "Reviewing courts," the Supreme Court has stated, "must not 'rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *BATF*, 464 U.S. at 97, 104 S.Ct. at 444 (quoting *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). The Secretary's interpretation of the 1981 Agriculture Act denying mandatory disaster payments to farmers experiencing prevented planting losses in counties where "multi-risk" crop insurance is offered for sale is exactly such an interpretation. It cannot stand in the light of our examination of the language and legislative history of the Act, or Congress' intent as manifested by the history of the disaster payments program.

### E. Relief

■ We believe that declaratory relief in the form of a ruling that the appellant

farmers are eligible for mandatory disaster payments for their prevented planting losses during the spring of 1984 is appropriate in this case.

We see no basis for entering a writ of mandamus to compel the Secretary to issue the mandatory payments to the appellant farmers. We have here held that the Secretary misinterpreted the eligibility provisions for the mandatory disaster payments under the 1981 Agriculture Act. We are confident that the Secretary will comply with our judgment by adopting appropriate regulations to provide for mandatory payments for prevented planting disasters consistent with congressional intent as we have determined in this opinion.

### III. CONCLUSION

Thus, we reverse and remand so that the district court may grant appellants appropriate declaratory relief setting forth the petitioners eligibility for mandatory disaster payments for prevented planting losses.[10]

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. It is my considered belief that the district court's judgment is correct and should be affirmed. Appellants essentially contend that crop insurance is not "available" within the meaning of 7 U.S.C. §§ 1444d(b)(2), 1445b–1(b)(2) (1982) (statutes) unless and until the government offers crop insurance for prevented planting losses. The Secretary, however, concluded that the plain language of the statutes and the legislative history

require mandatory disaster payments for prevented planting losses to be phased out as all-risk crop insurance expands into new counties.

In my opinion the majority, although articulating the proper standard of review, has failed to apply the proper standard and has instead chosen its own interpretation of the statutes. The Supreme Court has stressed that the interpretation of an agency charged with administering a complex statutory scheme may not be set aside if it is consistent with the statutory language and legislative history. *Chemical Mfrs. Ass'n v. Natural Resources Defense Council*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985). In *Young v. Community Nutrition Inst.*, 476 U.S. 974, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986), *citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), the Supreme Court repeated the appropriate standard of review:

'First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpreta-

---

**10.** The remand for declaratory relief in this case is not barred on jurisdictional grounds.

In this case, the Secretary observes that his function is to "carry out the [prevented planting disaster payment] program through the Commodity Credit Corporation." 7 U.S.C. §§ 1444d(h), 1445b–1(h). The enabling legislation for the Corporation, while permitting the Corporation to be sued, contains the restriction that "no attachment, injunction, garnishment or similar process mesne or final, should be issued against the corporation or its property." 15 U.S.C. § 714b(c) (1982). According to the Secretary, this provision bars suits to compel the issuance of benefits administered under the auspices of the Corporation.

Assuming that the Secretary's position is well taken, it still does not bar relief requiring the Secretary to frame regulations implementing the disaster payments program as intended by Congress. The Secretary concedes that a court may require the Secretary to frame such regulations in conformity with congressional intent. This court has gone no further than to determine the congressional intent of the legislation in question.

Thus the direction on remand to enter declaratory relief is within the jurisdiction of the federal courts and is not barred by the enabling legislation for the Commodity Credit Corporation. *Iowa, ex rel. Miller v. Block*, 771 F.2d 347, 348 n. 1 (8th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 3312, 92 L.Ed.2d 725 (1986).

tion. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible view of the statute.... [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.'

Under this standard, the Secretary's interpretation of the term "available" in the statutes must be upheld because the interpretation is reasonable and also consistent with the legislative history.

Subparagraph A authorizes the Secretary to make payments to producers on farms if they are unable to plant because of natural disaster. Subparagraph C of the statutes provides, however, that "producers on a farm shall not be eligible for [mandatory] disaster payments ... if crop insurance is available to them under the Federal Crop Insurance Act...." Subparagraph D (which immediately follows Subparagraph C), by contrast, authorizes the Secretary to make discretionary disaster payments where "no crop insurance covered the loss because of transitional problems attendant to the federal crop insurance program." *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 349–50 (8th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 3312, 92 L.Ed.2d 725 (1986). The Secretary could reasonably conclude from Congress' use of different language in Subparagraph C and Subparagraph D that Congress intended to establish different eligibility standards for mandatory and discretionary disaster payments for prevented planting losses. Subparagraph D expressly permits discretionary disaster payments only if federal crop insurance exists to cover the risk producing the loss. Significantly, Congress in Subparagraph C did not expressly condition the mandatory disaster payment in the same manner. Had Congress intended that the mandatory disaster payments be made where crop insurance covering the risk is unavailable, Congress would have said so as it did in Subparagraph D.

The history of these statutes also supports the Secretary's interpretation. Con-gress has amended the disaster payment programs several times and has altered the eligibility requirements to meet the perceived needs at the time. In 1977 and 1978, Congress expressly provided that farmers without access to prevented planting crop insurance were eligible for prevented planting disaster payments. 7 U.S.C. § 1445b–1(b)(2)(A). In 1985, Congress again made mandatory disaster payments available to farmers who were prevented from planting because of natural disasters. These amendments, modifying eligibility requirements and thus expanding and contracting the scope of coverage, clearly indicate that Congress intended to place different conditions on the mandatory and discretionary disaster payments.

The Secretary's interpretation of Subparagraph C is also consistent with the stated purpose of the statutes. Congress was concerned with the inequities and costs of the mandatory disaster payments and intended to replace the payments with federal crop insurance. Because of the possibility that federal crop insurance might not be available to all farmers during the transition period, Congress in Subparagraph D authorized the Secretary to make discretionary disaster payments to farmers for losses where federal crop insurance was unavailable to cover the losses. Congress thus anticipated that federal crop insurance might not be available to cover all risks, as in this case.

The district court applied the proper standard of review in this case and correctly determined that the Secretary's interpretation of the statutes was reasonable. Thus, I would affirm the judgment of the district court.