**SWANCO INSURANCE COMPANY—ARIZONA, Appellant,**

v.

**William D. HAGER, Commissioner of Insurance of the State of Iowa, Appellee.**

**No. 88–2113.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1988.

Decided July 12, 1989.

Rehearing Denied Aug. 23, 1989.

John C. Schachterle, Des Moines, Iowa, for appellant.

Fred M. Haskins, Des Moines, Iowa, for appellee.

Before BOWMAN and MAGILL, Circuit Judge, and BATTEY, District Judge.*

BOWMAN, Circuit Judge.

This appeal involves the Product Liability Risk Retention Act of 1981 *as amended by* the Liability Risk Retention Act of 1986, 15 U.S.C. §§ 3901–3906 (1982 & Supp. V 1987) (the Act), which authorizes persons and businesses with similar or related liability exposure to form "purchasing groups" for the purpose of purchasing liability insurance on a group basis and "risk retention groups" for the purpose of self-insurance. 15 U.S.C. § 3901(a)(4), (5). Because some states' laws make purchasing groups and risk retention groups illegal, the Act contains express provisions that preempt such laws. This appeal raises the question of whether, consistent with the Act, the State of Iowa may require an insurance company providing coverage to a purchasing group domiciled in another state but having members in Iowa to be licensed in Iowa.

## I.

In 1981, Congress enacted the Product Liability Risk Retention Act, Pub.L. No. 97–45, 95 Stat. 949 (1981) (1981 Act). The 1981 Act was Congress's response to the problems businesses had encountered in obtaining product liability coverage. Premiums had increased dramatically, and some businesses reportedly were unable to obtain coverage at any price. The 1981 Act attempted to redress the crisis by allowing businesses to purchase insurance at more favorable rates either by forming self-insurance pools called risk retention groups or by forming purchasing groups, which purchase group insurance from an existing insurer. Congress intended to reduce the cost and increase the availability of product liability insurance and to preempt certain state laws that prohibited or hindered the formation of these groups.

The 1981 Act was amended by the Liability Risk Retention Act of 1986, Pub.L. No. 99–563, 100 Stat. 3177 (1986), to expand the scope of the preemption to enable risk retention and purchasing groups to provide not only product liability insurance but all types of liability insurance. The 1986 Amendments also include provisions dealing with the permissible scope of state regulation of risk retention and purchasing groups.

This case involves the Ugly Duckling Rent–A–Car System, Inc. Risk Purchasing

---

* The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

Group, which is domiciled in Arizona, and has members in Iowa. Appellant Swanco Insurance Company (Swanco) is a corporation chartered and licensed in Arizona as a property casualty insurer, with its principal place of business in Tucson. Swanco, which is not licensed under Iowa law to issue insurance in Iowa, insures the Ugly Duckling Purchasing Group.

On July 22, 1987, appellee William D. Hager, Commissioner of Insurance for the State of Iowa, scheduled a hearing to determine whether Swanco was in violation of the Iowa Unauthorized Insurers Act for providing coverage to a purchasing group with members in Iowa. Swanco moved to dismiss the proceeding on the ground that the Act preempts application of the Iowa statute to Swanco, in that the Act required Swanco to be licensed only in the state where the purchasing group is domiciled. After a hearing examiner denied Swanco's motion, Swanco filed a complaint in the District Court seeking declaratory and injunctive relief.

On cross-motions for summary judgment, the magistrate [1] granted summary judgment in favor of the Commissioner on the ground that the Act does not preempt the Commissioner's authority to require an insurer providing coverage to purchasing group members in Iowa to comply with Iowa's licensing laws. [2]

Swanco appeals the magistrate's decision, contending that the plain meaning of the term "located" in section 4(f), [3] as well as the legislative history of that section, make it clear that a purchasing group is "located" in only one state, namely the state in which the group is domiciled. Swanco further argues that the Act as so construed preempts Iowa from requiring Swanco to be licensed in Iowa. Although we conclude that Swanco's reading of "located" in section 4(f) is correct, we nevertheless conclude that neither section 4(f) nor any other provision of the Act preempts states from applying licensing requirements that do not directly conflict with the express preemption provisions in section 4(a). Accordingly, we affirm.

## II.

◼ We consider first the meaning to be given to the phrase "the State in which the purchasing group is located" in section 4(f) of the Act, the pertinent part of which is set forth in the margin of this opinion at footnote 3.

The Commissioner contends that a purchasing group is "located" wherever the group has members, and therefore section 4(f) requires an insurer providing coverage to a purchasing group to be licensed (or an eligible surplus lines carrier) [4] in each state where the group has members. Swanco contends that section 4(f) requires the insurer to be licensed only in its state of domicile.

Based upon our reading of the Act, we conclude that Swanco's position is correct. We think it is significant that section 4(f) uses the term "the State" in the singular. It does not refer to "the States" or to "every State" in which the purchasing group is located, nor does it refer to "a

---

1. The parties consented pursuant to 28 U.S.C. § 636(c) to proceed before the Honorable Ronald E. Longstaff, United States Magistrate for the Southern District of Iowa.

2. Magistrate Longstaff did not issue a full opinion in this case, but instead incorporated by reference his order in *Frontier Insurance Co. v. Hager*, No. 87–645–E (S.D. Iowa April 27, 1988), a case involving virtually identical facts and issues.

3. 15 U.S.C. § 3903(f), which provides in part: "A purchasing group may not purchase insurance ... from an insurer not admitted in the State in which the purchasing group is located, unless the purchase is effected through a li-

censed agent or broker acting pursuant to the surplus lines laws and regulations of such State."

4. Most states allow insurers meeting certain capital requirements to do business as a surplus line carrier. A surplus line carrier is required to file, among other things, a financial statement with the state's commissioner. The process of gaining authority to do business as a surplus line carrier is more expeditious than the process of becoming fully licensed, and normally does not involve the review of rates. A surplus line carrier is not considered to be an admitted insurer, but rather does business with the approval of the commissioner.

State," a form which could be construed to mean multiple states. Furthermore, section 4(f) refers only to the location of "the purchasing group," and not the location of its "members." Other sections of the Act refer separately to "the purchasing group," "members of the group," and "its members," *see* 15 U.S.C. § 3903(a), (b), demonstrating a clearly drawn distinction between the purchasing group and its members. We therefore conclude that "the purchasing group" language of section 4(f) is not to be read as encompassing members of the group.

■ This conclusion—that section 4(f) refers to a single state—requires us to identify that state or, more precisely, to determine the statutory test for identifying the "state in which the purchasing group is located." Basing the state of location on the group's highest premium volume, or where the most members reside, or the state which has the greatest interest in the purchasing group's activities, would be problematic because these factors may not be easily ascertainable and may change over time. That is not to say that Congress could not have decided to base "location" on one of these factors. We do not believe, however, that Congress intended to do so, for it chose to gear other sections of the Act to the purchasing group's domicile. *See* 15 U.S.C. § 3901(a)(5)(D) (requiring that a purchasing group be domiciled in a state); 15 U.S.C. § 3903(d)(1)(A) (requiring a purchasing group to give notice of the group's state of domicile to a state in which it plans to do business). Further, the Act allows risk retention groups to declare the state in which the group will be chartered. *See* 15 U.S.C. § 3901(a)(4)(C)(i). Though the statute is not a model of clarity, we conclude that the state of location referred to in section 4(f) is the state in which the purchasing group is domiciled. Since in the present case the purchasing group is domiciled in Arizona, section 4(f) requires the insurer (Swanco) to be admitted only in Arizona, not in all the various states, including Iowa, in which the purchasing group has members. Accordingly, we reject the Commissioner's argument that section 4(f) requires insurers to be licensed in every state in which a group has members.

## III.

Our conclusion that section 4(f) requires the insurer to be licensed (or an eligible surplus lines carrier) in only the purchasing group's state of domicile does not end our analysis. The question remains whether Congress intended to exempt insurers of purchasing groups from the licensing and regulatory laws of nondomiciliary states. The Commissioner contends that under the reading of the Act that we have adopted in Part II of this opinion, section 4(f) should be viewed as a minimum federal requirement leaving nondomiciliary states free to enforce their licensing laws and regulations to the extent they are not inconsistent with the Act. Swanco counters that Congress, by enacting section 4(f), has preempted nondomiciliary states from regulating insurers of purchasing groups.

■ Preemption occurs when Congress, in enacting a statute, expresses a clear and manifest intent to preempt state law, *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); when there is an outright conflict between the federal law and state law, *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962); where Congress has legislated comprehensively, thus occupying the field so as to leave no room for the states to supplement federal law, *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); or where state law stands as an obstacle to the execution of the federal law passed by Congress, *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981). We begin our analysis with the well-established presumption against imputing to Congress an intention to preempt an area that traditionally has been left to state regulation. *See Wisconsin Educ. Ass'n Ins. Trust v. Iowa State Bd. of Pub. Instruction*, 804 F.2d 1059, 1064 (8th Cir.

1986) (citing *Jones v. Rath Packing Co.,* 430 U.S. at 525, 97 S.Ct. at 1309).[5]

It is undisputed that insurance is an area that traditionally has been left to state regulation. It also is undisputed that Congress intended the Act to preempt certain state laws that prohibited or hindered the formation of purchasing groups. The question then is whether the Iowa law requiring Swanco to be licensed in Iowa is preempted by section 4(f). In other words, does the Act overcome the presumption against preemption? Our task is to determine whether Congress plainly has demonstrated its intent that section 4(f) should have preemptive effect. To make this determination, we must look to the language and structure of the Act.

The Act creates two distinct alternatives, self-insurance by risk retention groups and group purchase of insurance by purchasing groups. Congress considered but rejected the creation of a comprehensive federal regulatory scheme for purchasing and risk retention groups. *See* H.R.Rep. No. 190, 97th Cong., 1st Sess. 6–7, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1432, 1435; *see also Home Warranty Corp. v. Caldwell,* 777 F.2d 1455, 1471–72 (11th Cir. 1985), *cert. denied,* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 118 (1986). Instead, Congress created separate and distinct preemption schemes for the two groups. "These carefully drafted provisions were designed to provide a 'workable legal framework' balancing the traditional authority of the states and the need for purchasing groups

to ameliorate the liability insurance crisis." *Insurance Co. of State of Pennsylvania v. Corcoran,* 850 F.2d 88, 91 (2d Cir.1988) (citing H.R.Rep. No. 865, 99th Cong., 2nd Sess. at 21, 1986 U.S.Code Cong. & Admin. News 5303, 5318).

■ Section 3 of the Act allows groups with similar types of risk to form and own their own insurance company to insure against their liability exposures. The risk retention group is chartered in the group's state of domicile and this state is primarily responsible for the group's regulation. *See* 15 U.S.C. § 3902(a)(1). The authority of nondomiciliary states is largely preempted. Section 3(a)(1) preempts "any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would— make unlawful, or *regulate,* directly or indirectly, the operation of a risk retention group." (emphasis added). The Act specifically enumerates the exceptions to this broad preemption. *See* 15 U.S.C. § 3902(a)(*l*)(A)–(I) (among the powers reserved to nondomiciliary states are the authority to tax business written in the nondomiciliary state, to require compliance with the nondomiciliary state's unfair claims and deceptive trade practices laws, and to require policies issued by risk retention groups to give notice that the nondomiciliary state's insurance laws and state guarantee funds might not apply). Thus, aside from the specific powers reserved to nonchartering states, the Act prohibits those states from regulating risk retention groups.[6]

**5.** In *United States v. South–Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), the Supreme Court held that insurance was commerce and therefore subject to the federal antitrust laws. In response to *South–Eastern,* Congress in 1945 passed the McCarran–Ferguson Act, which largely exempts the business of insurance from the federal antitrust laws and states in part:

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011. The McCarran–Ferguson Act further provides:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance....

15 U.S.C. § 1012(a), (b).

**6.** *See Home Warranty Corp. v. Caldwell,* 777 F.2d 1455, 1471 (11th Cir.1985) (risk retention groups are exempted from state regulation of insurance companies because they are not in the business of selling insurance to the public.).

The Act's approach to purchasing groups is quite different. Unlike section 3, which broadly preempts state law while enumerating specific laws that the state may enforce, section 4 expressly preempts only a limited number of specific state laws.[7] Nothing in the 1986 Amendments, which expanded the applicability of the 1981 Act to all forms of liability insurance, undermines the preemption structure developed by the 1981 Act.[8] The statutory meaning is clearly manifested in section 4(g), which states: "[n]othing in this chapter shall be construed to affect the authority of any State to make use of any of its powers to enforce the laws of such State with respect to which a purchasing group is not exempt under this chapter." 15 U.S.C. § 3903(g).

The language and structure of the Act thus strongly support the Commissioner's position that section 4(f) does not preempt a nondomiciliary state from imposing its licensing requirements upon insurers who wish to sell to purchasing group members in that state.

Swanco maintains that Congress intended to free purchasing groups and their insurers from multiple and inconsistent state regulations, and that allowing states to enforce their licensing laws defeats the purpose of the Act.[9] Although Swanco

---

7. Section 4(a) preempts:

any state law, rule, regulation, or order to the extent that such law, rule, regulation, or order would—

(1) prohibit the establishment of a purchasing group;

(2) make it unlawful for an insurer to provide or offer to provide insurance on a basis providing, to a purchasing group or its members, advantages, based on their loss and expense experience, not afforded to other persons with respect to rates, policy forms, coverages, or other matters;

(3) prohibit a purchasing group or its members from purchasing insurance on the group basis described in paragraph (2) of this subsection;

(4) prohibit a purchasing group from obtaining insurance on a group basis because the group has not been in existence for a minimum period of time or because any member has not belonged to the group for a minimum period of time;

(5) require that a purchasing group must have a minimum number of members, common ownership or affiliation, or a certain legal forum;

(6) require that a certain percentage of a purchasing group must obtain insurance on a group basis;

(7) require that any insurance policy issued to a purchasing group or any members of the group be countersigned by an insurance agent or broker residing in that State; or

(8) otherwise discriminate against a purchasing group or any of its members.

15 U.S.C. § 3903(a).

8. This conclusion, which is based upon our reading of the plain language of the 1981 Act and the 1986 Amendments, is fully supported by the House Report on the 1986 Amendments. As the House Report states:

In enacting the 1981 Act, it was recognized that there were a number of identifiable kinds of State laws that prevented the establishment and functioning of purchasing groups. Those laws were listed in Section 4(a) of the 1981 Act and it is those laws that are preempted. Subject to the prohibition on discrimination against purchasing groups, the states remained able to apply all their other laws to purchasing groups and *those dealing with such groups*. This approach is carried forward into the 1986 Act. Therefore, the Committee did not consider it necessary to itemize all the other laws to which purchasing groups remain subject.

H.R.Rep. No. 865, 99th Cong., 2d Sess. at 19 (emphasis added), 1986 U.S.Code Cong. & Admin.News p. 5316.

9. We note that the Secretary of Commerce has interpreted section 4(f) as preempting nondomiciliary states from regulating insurers of purchasing groups. *See* U.S. Dep't of Commerce, *Liability Risk Retention Act of 1986: Implementation Report*, Sept. 1987. We recognize that an agency's interpretation of a statute it is charged to administer is to be given deference. However, such deference is not warranted here. The Commerce Department is not charged with administering the Act, but merely has responsibility under the Act to report on its implementation. In any event, the Secretary's interpretation of section 4(f) is based on the Secretary's reading of the Act and legislative history, an exercise the Supreme Court has called a "quintessential judicial function." *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 444 n. 8, 78 L.Ed.2d 195 (1983). Although the agency's interpretation may be influential, it cannot bind this Court. "Reviewing courts cannot, in any case, be bound by a statutory interpretation they believe to be an aberration of Congress' intent.... The Secretary's interpretation of [Section 4(f) ] is exactly such an interpretation. It cannot stand in the light of our examination of the language and legislative history of the Act...." *Hall v. Lyng*, 828 F.2d 428, 435 (8th Cir.1987).

may be correct in stating that total preemption of nondomiciliary state regulation would enhance the ability of purchasing groups to operate, our reading of the statute does not permit us to accept Swanco's conclusion that the Act must be given a broad preemptive effect. Section 4(a) specifically preempts certain state laws. Except for those explicitly preempted laws, the Act leaves the states free to apply their laws in a nondiscriminatory manner.[10] Instead of total preemption, Congress "selected particularized means to [an] end in conscious recognition that a considerable area of state regulation would remain intact." *Corcoran*, 850 F.2d at 93 (rejecting insurer's argument that Congress intended wholesale preemption for purchasing groups). Swanco's position is at odds with the statutory scheme and thus cannot prevail.[11]

## IV.

In conclusion, we affirm the magistrate's grant of summary judgment in favor of the Commissioner on the ground that Iowa is not preempted under the Act from requiring Swanco to comply with Iowa's licensing requirements.

10. Allowing nondomiciliary states to enforce their licensing and regulatory laws not preempted by section 4(a) burdens an insurer of a purchasing group no more than any other insurer desiring to market its policies in several states.

11. Swanco also argues that Section 515E.9 of the Iowa Insurance Code, Iowa Code Ann.

§ 515E.9 (West Supp.1989), which was enacted during the pendency of this appeal, undermines the Commissioner's position. We decline to address this issue since it is raised for the first time on appeal. Because it involves the interpretation of state law, it is especially appropriate that it be addressed initially at the trial court level.