**SHAKOPEE MDEWAKANTON SIOUX COMMUNITY, a federally recognized Indian Tribe, Little Six, Inc., a corporation chartered by the Shakopee Mdewakanton Sioux Community, Plaintiffs,**

v.

**Anthony J. HOPE, in his capacity as Chairman of the National Indian Gaming Commission, Jana McKeag, in her capacity as Commissioner on the National Indian Gaming Commission, National Indian Gaming Commission, a commission established within the United States Department of the Interior, Defendants.**

**The LOWER SIOUX INDIAN COMMUNITY IN MINNESOTA, Plaintiff,**

v.

**NATIONAL INDIAN GAMING COMMISSION, William Barr, Attorney General of the United States, Defendants.**

Nos. Civ. 4–92–343, 4–92–482.

United States District Court,
D. Minnesota,
Fourth Division.

July 27, 1992.

As Modified Aug. 11, 1992.

---

William J. Keppel, James E. Townsend, Steven M. Christenson, Dorsey & Whitney, Minneapolis, Minn., Kurt Van BlueDog,

BlueDog Law Office, Bloomington, Minn., for plaintiffs Shakopee Mdwakanton Sioux Community and Little Six, Inc.

John E. Jacobson, Jacobson, Buffalo & Schoessler, Minneapolis, Minn., for plaintiff The Lower Sioux Indian Community in Minnesota.

Thomas B. Heffelfinger, U.S. Atty., and Robert M. Small, Asst. U.S. Atty., Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, Chief Judge.

These related matters are before the Court on cross-motions for summary judgment. Defendants' motions will be granted; plaintiffs' motions will be denied.

FACTS

Plaintiffs Lower Sioux Indian Community and Shakopee Mdewakanton Sioux Community are federally recognized Indian tribes; plaintiff Little Six, Inc. is a tribally chartered corporation created and wholly owned by the Shakopee Mdewakanton Sioux Community. Plaintiffs challenge regulations promulgated by the National Indian Gaming Commission (the commission) that classify the game of keno as a Class III game that cannot be offered on tribal land absent a tribal-state compact.[1]

Under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701–2721, gaming on Indian lands is divided into three categories. Class I gaming includes social games or traditional forms of Indian gaming occurring in connection with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Tribes have exclusive jurisdiction over Class I gaming. 25 U.S.C. § 2710(a). Class II gaming includes bingo, games similar to bingo, and certain card games. 25 U.S.C. § 2703(7). Class II gaming is regulated by the commission and a tribe need not negotiate a tribal-state compact in order to offer it. 25 U.S.C. § 2710(b). All other gaming is considered class III gaming. 25 U.S.C. § 2703(8). Class III gaming is regulated by the individual states, and tribes who offer it must do so pursuant to a tribal-state compact. 25 U.S.C. § 2710(d).

The IGRA established the commission to regulate Indian gaming, and specifically authorized the commission to promulgate the regulations and guidelines necessary to implement the provisions of the act. 25 U.S.C. §§ 2704, 2706(b)(10). In April 1992, the commission promulgated regulations regarding definitions under the IGRA. 57 Fed.Reg. 12,382 (1992). The regulations categorize keno as a casino game that falls within class III. 25 C.F.R. § 502.4. Plaintiffs maintain that keno is actually a game similar to bingo that falls within class II.

The basic nature of keno, as it is played on Indian lands in Minnesota, is not in dispute. A player selects anywhere from one to twenty numbers from a card that contains eighty sequentially numbered squares; the numbers selected are entered into a computer, and the player keeps a copy of the card. The house then draws twenty numbered balls from a bingo blower, and the numbers are posted on electronic boards so that the player may compare the numbers drawn with the numbers selected on the game card. Players win if the numbers drawn correspond to the numbers they selected. John Scarne, *Scarne's New Complete Guide to Gambling* 491–92 (Simon and Schuster 1986) (Defs.' Ex. D); Affidavit of Dennis Prescott Ex. 4. The odds of winning, and therefore the amount that may be won, depend upon the number of numbers players seek to match and the number of matches they actually get. For example, players at the Lower Sioux Community's casino, Jackpot Junction, could win three times their bets by selecting and matching one number, but could win 750 times their bets by selecting and matching five numbers or ten times their bets by selecting five numbers and matching four numbers. Prescott Aff. Ex. 4. Because

---

1. The Lower Sioux Community has in the past offered keno at its casino, Jackpot Junction, but has ceased offering it pending the outcome of this action. The Shakopee Mdewakanton Sioux Community and Little Six wish to offer keno at their casino, Mystic Lake, but have not yet done so, because of the regulations. Plaintiffs will be referred to collectively unless otherwise indicated.

the game is based upon the numbers selected by the individual players, a game of keno could have no winners or multiple winners. At Jackpot Junction, if no person won a prize in a given game, all players won the right to play again for free. *Id.*

Bingo, too, is based on matching numbers drawn from a bingo blower. In a classic game of bingo, however, players do not select their own numbers as in keno, but purchase cards with numbers printed on them. As numbers are drawn from the blower, players cover the numbers on their cards. The first person to cover the numbers in a designated pattern (often five in a row) calls "bingo" and wins the game. The winnings of the bingo player depend upon the set prize offered for the game, not on bets made by the player. *See* Supp. Prescott Aff. ¶ 4. There are numerous variations on the classic game of bingo. In "pick your own" bingo, players select their own numbers, as in keno. Prescott Aff. Ex. 1. In "jackpot" or "progressive" bingo, certain prizes continue to accumulate until someone wins a game. 57 Fed.Reg. at 12,382. Some games of bingo end after the first player gets and calls "bingo," while some games of bingo offer prizes to subsequent winners. Prescott Aff. ¶ 4 & Ex. 3.

Plaintiffs assert that the commission's determination that keno is a class III game, rather than a game similar to bingo, was arbitrary and capricious. The parties in both actions have brought cross motions for summary judgment.

## DISCUSSION

■ A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether,

as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### I. *Scope of Review*

The parties dispute the scope of review applicable to the agency's determination in this case. Defendants argue for a deferential scope of review under which the Court determines whether the agency's construction of the statute is a permissible one. Plaintiffs argue that the Court need not defer to the agency's interpretation of the statute, because the Court is fully competent to determine congressional intent; they also argue that because the IGRA was intended to benefit tribes, any ambiguity in the statute must be resolved in their favor. In addition, the Shakopee Mdewakanton plaintiffs argue that the regulation at issue is an interpretative rule that is not entitled to deference.

■ The distinction between interpretive rules and legislative rules is rooted in the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* The APA exempts

from its rulemaking procedures "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b)(A). While an interpretative rule is entitled to only such deference as its "inherent persuasiveness commands," *Drake v. Honeywell, Inc.*, 797 F.2d 603, 607 (8th Cir.1986) (citing *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C.Cir.1980)), a legislative rule must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The line between legislative and interpretative rules is sometimes fuzzy. In general, though, interpretive rules are nonbinding agency statements that clarify or explain existing law or regulations. *McKenzie v. Bowen*, 787 F.2d 1216, 1222 (8th Cir.1986). They do not foreclose alternative courses of agency action or conclusively affect rights of private parties. *Batterton*, 648 F.2d at 702. Legislative rules, on the other hand, fill in statutory gaps that an agency is authorized to fill. They create rights, impose obligations, and constrict the discretion of agency officials by determining the issue addressed. In short, they have the force and effect of law. *Drake*, 797 F.2d at 607; *McKenzie*, 787 F.2d at 1222; *Batterton*, 648 F.2d at 701–02.

■ The Shakopee Mdewakanton plaintiffs argue that the commission regulations merely offer clarification or guidance regarding the definition of class II gaming, a term defined by statute. Therefore, they argue, the regulations are entitled to no deference. The Court disagrees with the plaintiffs, for several reasons. First, the regulation at issue does not merely clarify the statutory definition of class II gaming; rather, it defines "game similar to bingo," a term not defined in the statute. Thus, in promulgating the regulation, the commission was filling in statutory gaps that it was authorized to fill. Second, as defendants point out, the regulation is not merely a nonbinding statement of agency policy, but is a substantive rule affecting the right of parties such as plaintiffs to offer keno to the public. Third, the fact that the agency

promulgated the regulations in accordance with the notice and comment requirements of the APA suggests that it was exercising its statutory authority to make legislative rules. Therefore, the Court will treat the regulation as a legislative rule construing the IGRA.

■ A court reviewing an agency's construction of a statute that the agency administers must employ a two-part analysis. First, the court must consider whether Congress has spoken to the precise issue at hand; if Congress's intent is clear and unambiguous, both the court and the agency are obligated to effectuate that intent. *Chevron, U.S.A. v. Natural Resources Defense Fund*, 467 U.S. 837, 841, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Thus, the judiciary, as the final authority on issues of statutory construction, must reject administrative constructions that violate congressional intent. *Id.* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. If the statute is silent or ambiguous on the question at issue, the court must perform the second part of the analysis, which is to determine whether the agency's answer rests on a permissible construction of the statute. If it does, the court may not disturb the agency's determination, even if other constructions would also be permissible and even if the court would have reached a different conclusion than the agency did. In addition, if Congress has explicitly left a gap for the agency to fill, the regulation promulgated to fill that gap must be given controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute. *Id.* at 843, 104 S.Ct. at 2782.

Plaintiffs argue that instead of applying the deferential standard of review set forth in *Chevron*, the Court should review the statutory construction expressed in the keno regulation de novo. Plaintiffs rest this argument primarily on *Maloley v. R.J. O'Brien & Assoc., Inc.*, 819 F.2d 1435, 1441 (8th Cir.1987), in which the court stated that the standard of review in that case turned on "practical policy considerations of the comparative qualifications and competencies of courts and agencies." The Shakopee Mdewakanton plaintiffs argue

that while the Court is fully competent to determine issues of statutory interpretation and congressional intent, the commission is a brand new agency with no experience in interpreting statutes and no demonstrated expertise on the subject of gaming. The Lower Sioux Community argues that because the agency denominated its rule an implementation of congressional intent, the Court need not defer to its interpretation.

The Court concludes that plaintiffs' reliance on *Maloley* is misplaced. The *Maloley* court was not reviewing an agency's exercise of its rulemaking authority, but rather the agency's application of law to facts while performing adjudicative functions. The court noted that two standards had been applied in reviewing an agency's application of law to facts, a de novo standard and a reasonableness standard. The court then stated that the choice between those two standards in a given case depended upon the comparative competence of courts and agencies regarding the issue at hand. Because *Maloley* involved the appropriate standard of review for an agency's application of law to facts, rather than for an agency's exercise of its rulemaking authority, it is inapplicable to the case at bar.

Plaintiffs also argue that *Hall v. Lyng*, 828 F.2d 428 (8th Cir.1987), supports their assertion that no deference is owed to the agency's statutory construction. In *Hall*, the court emphasized that an agency's statutory interpretation could not bind a court, and that a reviewing court was not merely to rubberstamp administrative decisions. *Id.* at 435. *Hall* did not, however, state that agency interpretations should be given no deference; rather, it stated that an agency interpretation that is contrary to congressional intent must be held unreasonable. Thus, *Hall* is consistent with the analysis set forth in *Chevron*, and the Court will apply the *Chevron* analysis in this case.

## II. *Application of the Chevron Analysis*

As noted above, the first step in the *Chevron* analysis is to determine whether Congress has directly spoken to the precise issue at hand, that is, whether keno is a class II game or a class III game. The IGRA provides:

> (7)(A) The term "class II gaming" means—
>
> > (i) the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)—
> >
> > > (I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,
> > >
> > > (II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and
> > >
> > > (III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards,
>
> including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo. . . .
>
> > . . . .
>
> (B) The term "class II gaming" does not include—
>
> > (i) any banking card games, including baccarat, chemin de fer, or blackjack (21). . . .
>
> > . . . .
>
> (8) The term "class III gaming" means all forms of gaming that are not class I gaming or class II gaming.

25 U.S.C. §§ 2703(7), (8).

Neither the statute nor its legislative history makes any mention of keno. Because the statute is silent on the precise question at hand, the Court must turn to the second part of the *Chevron* analysis and determine whether the agency's answer to the question is based on a permissible construction of the statute. The commission promulgated four regulations that are relevant to the issue before the Court. First, the commission defined class II gaming as

> (a) Bingo or lotto (whether or not electronic, computer, or other technologic aids are used) when players:

(1) Play for prizes with cards bearing numbers or other designations;

(2) Cover numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined; and

(3) Win the game by being the first person to cover a designated pattern on such cards;

(b) If played in the same location as bingo or lotto, pull-tabs, punch boards, tip jars, instant bingo, and other games similar to bingo....

25 C.F.R. § 502.3. Second, the commission defined games similar to bingo as "any game that meets the requirements for bingo under § 502.3(a) of this part and that is not a house banking game under § 502.11 of this part." 25 C.F.R. § 502.9. Third, the commission defined house banking game as "any game of chance that is played with the house as a participant in the game, where the house takes on all players, collects from all losers, and pays all winners, and the house can win." 25 C.F.R. § 502.11. Finally, the commission defined class III gaming as "all forms of gaming that are not class I gaming or class II gaming, including but not limited to: (a) Any house banking game, including but not limited to ... (2) Casino games such as roulette, craps, and keno...." 25 C.F.R. § 502.4.

The house banking game concept is critical to the regulatory scheme. The commission believed that "house banking games are a subset of casino games that Congress intended to include in class III;" it therefore adopted the house banking game concept as a "simple test for implementing congressional intent." 57 Fed.Reg. 12,382, 12,385. In accordance with this test, the commission placed keno within class III, because keno is a house banking game and because keno is not won by the first person covering a previously designated arrangement of numbers. In the commission's view, the IGRA contemplated that in games similar to bingo, the house would designate the arrangement, and many players would attempt to cover that arrangement. *Id.* at 12,383. In addition, the commission noted that while there could be many winners or no winners in a game of keno, there was generally only one winner in a game of bingo. *Id.* at 12,385.

In placing keno in class III, the commission rejected the argument that keno's historical relationship to bingo made it a game similar to bingo. *Id.* at 12,383. The commission also rejected the suggestion that the critical factor in determining whether a game was similar to bingo was whether the game presented the same operational characteristics and security demands as bingo; the commission believed that Congress intended the similarity issue to turn on the statutory criteria for bingo and on whether the game was a house banking game, not on the game's attendant security risks. *Id.* at 12,387. Finally, the commission determined that the classification of keno could not depend upon the impact it would have on tribal self-sufficiency and economic development, because, while those are the intended results of well-regulated Indian gambling, they are not legally useful concepts for distinguishing one class of gaming from another. *Id.* at 12,385.

Some commenters expressed concern over the effect the house banking test would have on various forms of bingo. As noted above, the commission defined "game similar to bingo" as a game that has the three statutory characteristics of bingo and is not a house banking game. The commission determined that "games such as u-pickem, speed bingo, nonbanking French bingo and other games in which the house designates a pattern different from traditional or classic bingo fall within the definition of games similar to bingo," while games that incorporate bingo but are house banking games, such as bingojack, would not be considered games similar to bingo. *Id.* at 12,387. The commission also stated that bingo games with guaranteed prizes and jackpot or progressive bingo would fall within class II, so long as there was eventually a winner (that is, the house never took the jackpot) and there was a winner of a consolation prize in each game. *Id.* at 12,382, 12,387. In response to commenters who argued that bingo itself is a house banking game, the commission stated that

"whether a game is a house banking game ... is not relevant to the classification of games that Congress expressly placed in class II: Bingo, lotto, pull-tabs, instant bingo, and tip jars." *Id.* at 12,388.

Defendants argue that the commission's determination to place keno in class III is based on a permissible construction of the statute. They point out that the senate report accompanying S. 555 (which became the IGRA), states:

> [C]lass II is the term used for bingo, lotto, some types of card games, as well as other forms of bingo-type gaming such as pull-tabs, punch cards, tip jars, and the like. Class III is all other forms of gaming—slot machines, *casino games including banking card games*, horse and dog racing, pari-mutuel, jai-alai, and so forth.

S.Rep. No. 446, 100th Cong., 2d Sess. 3 (emphasis added), U.S.Code Cong. & Admin.News 1988, pp. 3071, 3073. The report later identifies as class III gaming "all gaming that is not class I or class II, i.e., banking cards, all slot machines, *casinos*, horse and dog racing, jai-alai." *Id.* at 7 (emphasis added), U.S.Code Cong. & Admin.News 1988, p. 3077. Finally, defendants point out that Congressman Udall, the floor manager for the bill, summarized class III gaming activities as "casino gambling and parimutuel betting." 134 Cong. Rec. H25,376 (1988). Defendants argue that, given this legislative history, the commission's determination that Congress intended to place casino games in Class III is clearly a permissible construction of the statute. Because house banking games are casino games, and because keno is a house banking game, defendants argue that the regulations effectuate Congress's intent.

The Lower Sioux Community argues that review of the legislative history reveals that the commission's regulations do not effectuate congressional intent. The Lower Sioux Community points out that the IGRA represents an attempt "to balance the need for sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land." S.Rep. No. 446, 100th Cong., 2d Sess. 5 (1988), U.S.Code Cong. & Admin.News 1988, p. 3075. The IGRA struck that balance by assuring that "tribes have maximum flexibility to utilize games such as bingo and lotto for tribal economic development," *id.* at 9, U.S.Code Cong. & Admin.News 1988, p. 3079, while subjecting "banking card games and slot machines" to state regulation. *Id.* at 10, U.S.Code Cong. & Admin.News 1988, p. 3080. The purpose of this distinction, the senate report states, "is to acknowledge the important difference in regulation that such games and machines require and to acknowledge that a tribal-State compact for regulation of such games is preferable to Commission regulation." *Id.* at 10, U.S.Code Cong. & Admin.News 1988, p. 3080.

In addition to the senate report for S. 555, the Lower Sioux Community relies upon statements made during the floor debate on the bill in the House of Representatives, in which one representative stated,

> The debate and this bill are about regulation of the kind of high-stakes gambling that for the most part has not yet appeared on Indian reservations. This so-called class III gaming includes horse racing, dog racing, jai alai and certain casino-type card games and gambling devices. No one can deny that these very lucrative and easily corrupted games have long been the target of organized and sometimes intensive criminal activity. That is why the States that allow such gaming activities subject them to very strict regulation.

134 Cong. Rec. H25,378 (1988). Another representative made a similar remark, commenting that,

> S. 555 seeks to balance the legitimate interest of the Indian tribes with the need to regulate gaming on Indian lands in order to minimize or avoid the effects of the actions of unscrupulous operators.... Supervision and control of class III gaming, which includes horse racing, dog racing, casino gaming including slot machines, jai alai and similar activities would be a State function....

This is most appropriate given the expertise of the State class III gaming regulators on the oversight and control of this complex class of gaming.

*Id.* at H25,381.

The Lower Sioux Community argues that this legislative history establishes that Congress intended for state regulation to be imposed on tribal governments only where there was a clear, compelling, security-related need for the imposition. Thus, it argues, the commission erred in not basing the distinction between class II and class III gaming on a case-by-case analysis of the security risks inherent in a particular game.

 The Court concludes that the commission's determination that Congress intended to place casino games in class III is a permissible construction of the statute. The legislative history cited by defendants clearly reveals that Congress viewed high-stakes casino gambling as fundamentally different from bingo and the other games designated as class II games in 25 U.S.C. § 2703(7)(A). In addition, in a portion of the committee report not cited by the parties, the committee stated that section 2703(7)(A) reflected the "intent that pull-tabs, punch boards, tip jars, instant bingo and similar sub-games may be played as integral parts of bingo enterprises regulated by the act ... as opposed to free standing enterprises of these sub-games." S.Rep. No. 446, 100th Cong., 2d Sess. 9 (1988), U.S.Code Cong. & Admin.News 1988, p. 3079. This statement indicates that Congress indeed made a distinction between the type of games played as part of "bingo enterprises" and the type of games played in casinos, and intended the latter to be placed in class III.

The legislative history also supports plaintiffs' view that the distinction between casino gaming and bingo-type gaming was based on Congress's concern about the different security risks attending each type of gaming. However, nothing in the legisla-

tive history compels the conclusion that Congress's security concerns could only be addressed by a case-by-case analysis of the type of risks a particular game presents. The commission determined that a better way to address the security concerns was to develop a bright line test for determining what games were casino games and what games were the type of games played as part of bingo enterprises. The commission's approach certainly has administrative advantages, and neither the statute nor its legislative history prohibits the commission's approach.

In addition to arguments based on the IGRA's legislative history, plaintiffs make two statutory arguments. First, both the Lower Sioux Community and the Shakopee Mdewakanton plaintiffs argue that the commission's determination that keno is a class III game violates one of the stated purposes of the statute, which is to protect gaming as a means of generating tribal revenue. 25 U.S.C. § 2702(3). They also argue that the commission's decision violates a canon of construction holding that statutes passed for the benefit of Indian tribes must be liberally construed, with doubts being resolved in the tribes' favor.[2] *Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *United States v. Sisseton-Wahpeton Sioux Tribe,* 897 F.2d 358, 366–67 (8th Cir.1990).

These arguments, however, ignore the fact that protecting gaming as a means of generating tribal revenue is not the sole purpose of the IGRA; the statute was also intended to meet congressional concerns regarding gaming, shield Indian gaming from organized crime and other corrupting influences, and assure that gaming is conducted fairly and honestly by both operators and players. 25 U.S.C. § 2702(2), (3). Thus, the purposes underlying the IGRA are both varied and possibly conflicting. To deem that any interpretation of the act that conflicts with the desires of some tribes is invalid would privilege one purpose of the statute over others. In addi-

2. This canon of construction may in some cases conflict with *Chevron's* requirement that courts defer to permissible agency interpretations. Some courts resolve this clash by declining to apply the canon when it conflicts with the requirement of deferential review. *See, e.g., Haynes v. United States,* 891 F.2d 235, 239 (9th Cir.1989).

tion, to the extent that the commission's rule protects the integrity of Indian gaming, it must be seen to advance and not hinder tribal interests. Gaming that is corrupt or inadequately regulated would not advance the statutory purpose of "promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1).

Plaintiffs' second statutory argument is that the commission's application of the house banking concept to games other than card games is based on an unreasonable construction of the IGRA. Plaintiffs point out that 25 U.S.C. § 2703(7)(B)(i) specifically provides that class II gaming does not include "any banking card games." Thus, plaintiffs argue, Congress was aware of the concept of house banking games and chose to apply it to card games only. In addition, the Shakopee Mdewakanton plaintiffs assert that under the commission's definition, pull-tabs, tip jars, punchboards, and lotto are house banking games, yet the IGRA specifically places them within class II.

In response, defendants reiterate the commission's response to similar arguments raised in the rulemaking process: the house banking concept is not relevant to games expressly classified by Congress. Defendants argue that the house banking concept applies only to determine whether a particular game is a "game similar to bingo," because that is the only category within class II for which a test is necessary. Without the house banking game test, defendants assert, there would be no way to distinguish between games that are like bingo in their financial relationship to the house and games that, while they have some elements similar to bingo, are actually casino games in which the house has a direct stake in the game and can win or lose. The house banking concept is in defendants' view a necessary tool to enable the commission to deal with the continuing evolution of games and the inventiveness of parties who would like to see a given game placed in a given category.

As noted above, the IGRA includes in class II bingo and "(if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. § 2703(7)(A). At first blush, it would seem that the most logical way in which to determine what other games are similar to bingo would be to determine what characteristics are common to bingo, pull-tabs, lotto, punch boards, tip jars, and instant bingo. The commission, however, did not take that approach; instead, it decided to define "game similar to bingo" without analyzing the common elements of the other games. The parties have submitted no information regarding the nature of pull-tabs, lotto, punch boards, tip jars, and instant bingo; indeed, although the Shakopee Mdewakanton plaintiffs assert that these are house banking games, they have not supported that assertion with any facts or analysis.

It appears, however, that the enumerated games have very little in common with bingo, except for the location in which they might be played. Both the statute and its legislative history support this view. Under the statute, pull-tabs, lotto, punch boards, tip jars, and instant bingo would *not* be considered class II games, regardless of their characteristics, if they were not played in the same location as bingo. 25 U.S.C. § 2703(7)(A)(i). In its discussion of section 2703(7)(A)(i), the senate report states that the enumerated games "may be played *as integral parts of bingo enterprises regulated by the act, and, as opposed to free standing enterprises of these sub-games, state regulatory laws are not applicable to such sub-games.*" S.Rep. No. 446, 100th Cong., 2d Sess. 9 (1988) (emphasis added), U.S.Code Cong. & Admin.News 1988, p. 3079. Given the emphasis on location and type of gaming facility in both the statute and its legislative history, it was not unreasonable for the commission to shift its focus from the shared characteristics of the enumerated games and search for some other means of effectuating Congress's intent.

The commission was faced with the task of implementing Congress's distinction between games offered by casinos and games offered by bingo enterprises with very little guidance from the statute. The commission finally drew the distinction by borrowing a concept that Congress had ex-

pressly applied to card games. The senate report states that the "distinction is between those games where players play against each other rather than the house and those games where players play against the house and the house acts as banker." *Id.* Congress placed card games in which the players play against each other in class II, 25 U.S.C. § 2703(7), while placing card games in which the players play against the house in class III. Because the legislative history suggests that Congress reserved class III for casino games and other high-stakes gambling, it is not unreasonable to infer that Congress intended class III, casino-type gaming to include games in which the players play against the house and the house acts as banker—that is, to include house banking games.

The commission's reasoning is not a model of clarity. The commission's interpretation, however, has statutory support, and to invalidate the regulations would be to involve the Court in scrutinizing the intricate rules of numerous games in order to determine what games are similar to bingo under the IGRA. The commission, not the Court, is the appropriate body to undertake that task. Therefore, the Court will defer to the agency's interpretation of the IGRA.

### III. *The Similarity of Keno and Bingo*

A final issue raised by both tribes is whether keno is a game similar to bingo. Both tribes take the position that keno has the statutory characteristics of bingo, although they draw different conclusions from this fact. The Lower Sioux Community argues that because the form of keno played at Jackpot Junction has the statutory characteristics of bingo, the commission has failed to follow its own regulations in labeling it a class III game. The Shakopee Mdewakanton plaintiffs argue that because keno has the statutory characteristics of bingo, the plain meaning of the IGRA compels the conclusion that keno is a class II game; thus, the Shakopee Mdewakanton plaintiffs proffer the similarity of keno and bingo as an additional argument for finding the commission's regulation unreasonable.

The Shakopee Mdewakanton plaintiffs argue that the history of keno is inter-twined with that of bingo, and that dictionaries, courts, and gaming experts have recognized the similarity of the two games. The original game of keno was like bingo; it was played with cards bearing five rows of five numbers each, numbers were drawn, and the first person to match five numbers in a row on his card yelled "keno" and won the game. C. Davis, *Something for Nothing* 171–72 (J.B. Lippincott Co. 1955) (Mdewakanton Pls.' Ex. 6). The modern version of keno, however, is not the same as bingo, but derives from a lottery game brought to this country by Chinese laborers in the 1850s. That game involved selecting Chinese characters (or later, arabic numbers) from a card and placing bets on whether the characters or numbers selected would match the characters or numbers drawn. In an effort to evade Nevada laws prohibiting lotteries, the numbers were replaced with racehorses and the game dubbed Race Horse Keno. The original game of keno then became known as bingo in Nevada. W. Nolan, *The Facts of Keno* 11–20 (Casino Press) (Mdewakanton Pls.' Ex. 6).

Plaintiffs would have the Court read this history as establishing that bingo and keno are similar. In the Court's view, however, it establishes instead that the name "keno" can refer to two distinct games, one that is identical to bingo and one that is not. Given this fact, it is not surprising that plaintiffs can point to numerous dictionaries and gaming encyclopedias defining keno as a game similar to bingo. The issue in this case, however, is whether keno is a game similar to bingo under the definition set forth in the IGRA.

Although the Shakopee Mdewakanton plaintiffs point to cases stating that keno is similar to bingo, none of those cases consider whether keno is a game similar to bingo under the IGRA. Rather, as defendants point out, some of the cases cited deal with whether bingo is a lottery for the purposes of state constitutional prohibitions on lotteries, *see, e.g., Knight v. State,* 574 So.2d 662, 664 (Miss.1990), or whether keno falls within state statutes defining bingo broadly, *see, e.g., Gallatin County v. D & R Music and Vending, Inc.,* 201 Mont. 409,

654 P.2d 998 (1982). Other cases hold that keno is similar to bingo, but deal with the type of keno that is identical to bingo, rather than with the type of keno that plaintiffs wish to offer at their casinos. *See, e.g., Greater Loretta Improvement Assoc. v. State*, 234 So.2d 665 (Fla.1970). The remainder of plaintiffs' cases contain off-hand descriptions of keno as a variant of bingo, where the nature of keno was not an issue in the case. *See, e.g., United Keetoowah Bank of Cherokee Indians v. State*, 927 F.2d 1170 (10th Cir.1991). Because none of the cases cited address IGRA's definition of bingo, they are not germane to the issue before the Court.

The IGRA defines bingo as a game having three characteristics. First, the game must be played for prizes with cards bearing numbers or other designations. 25 U.S.C. § 2703(7)(A)(i)(I). Second, the holder of the card must cover the numbers or designations when similarly numbered or designated objects are drawn. 25 U.S.C. § 2703(7)(A)(i)(II). Third, the game must be won by the first person covering a previously designated arrangement of numbers or designations on the card. 25 U.S.C. § 2703(7)(A)(i)(III). The parties agree that keno possesses the first statutory characteristic of bingo, but dispute whether it possesses the other two characteristics.

Defendants argue that keno differs from bingo in five ways.[3] First, while in bingo there is typically one winner (the first to call "bingo"), in keno there may be many winners or no winners. Second, instead of holding a card as the game is played and covering numbers when they are drawn and announced, keno players complete their tickets with self-selected numbers and submit them to the house prior to the random number selection. Third, while in bingo there is a winning pattern announced prior to the game (for example, five numbers

that appear in a row on the game card), keno depends upon matching numbers without regard to a predetermined pattern. Finally, in bingo the house may draw four numbers or sixty numbers or draw numbers until there is a winner, while in keno, the house always draws twenty numbers.

In sum, defendants argue that bingo is traditionally a social game in which each player plays against all other players in a race to be the first to yell "bingo;" in keno, each player places a bet and simply wins or loses that bet, regardless of the actions of other players. The statutory requirements that the player cover numbers when similar numbers are called and that the game is won by the first person covering a previously designated arrangement of numbers are, in defendants' view, an attempt to capture in a definition the distinction between the traditionally social game of bingo and casino games like keno.

Plaintiffs argue that keno meets both the "cover" requirement and the "first-to-win" requirement of the statute. "Cover," they argue, is synonymous with "match." Players in both keno and bingo seek to match the numbers that the house randomly selects with the numbers on their game cards. In both games, the numbers on the cards are selected first and randomly selected numbers are drawn later. Moreover, plaintiffs point out that the first keno player to cover or match the drawn numbers does win the game. The fact that others may also win the game is in plaintiffs' view irrelevant, especially given the commission's determination that jackpot or progressive bingo (which may have more than one winner) is a class II game.

In making these arguments, plaintiffs propose a mechanical and hypertechnical reading of the statute at the expense of the statute's plain meaning. Simply put, the statute defines a game in which players

---

**3.** Defendants also argue that in keno, unlike in bingo, players select their own numbers on a keno ticket. Plaintiffs point out, however, that in some games of bingo, players also select their own numbers. Whether these "do-it-yourself" versions of bingo would qualify as class II games under the commission's regulations is questionable. While the commission stated that "u-pickem" bingo is a class II game, it defined u-pickem bingo as a game "in which *the house*

designates a pattern different from traditional or classic bingo." 57 Fed.Reg. at 12,387 (emphasis added). The commission also stated that in games similar to bingo, the house designates the arrangement and many players attempt to cover it. *Id.* at 12,383. In any event, the issue of whether bingo is a class II game when players select their own numbers is not before the Court in this case.

have cards with numbers on them, cover the numbers when similar numbers are drawn, and win by being the first player to cover a previously designated arrangement of numbers. The definition describes both the actions and the sequence of actions in the game, and the game is quite clearly the common game of bingo.

In keno, players select numbers, bet the house that the selected numbers will match the drawn numbers, and win if the selected numbers do match the drawn numbers. This is clearly not a game similar to the one described in the statute. Players may of course watch as the house selects the numbers and match the numbers on their card as the numbers are drawn, but that is not an element of the game. Keno players could also wait until all the numbers were drawn and then check for matches, because keno players are not required to cover numbers on a game card when numbers are called. Similarly, while the first person to match the numbers on a keno card does win the game, and while in some bingo games subsequent persons could also win the game,[4] the timing of the match is not an element of keno. Plaintiffs' argument seems to be that an individual keno player *could* play keno in a such a way that it would have the statutory hallmarks of bingo. However, covering numbers when they are drawn and being the first to cover numbers are not rules of keno and are irrelevant to winning a game of keno. In addition, plaintiffs' arguments do not address in any way the requirement that the winner of the bingo game cover a previously designated *arrangement* of numbers on the card. The arrangement of the numbers on the game card is completely irrelevant to keno.

The Court concludes that keno does not have the statutory characteristics of bingo, and therefore cannot be considered a game similar to bingo within the meaning of the IGRA. Thus, even if the Court were to find that the commission's house banking game distinction was based on an impermissible construction of the statute, keno would still be properly placed in class III and could not be offered without a tribal-state compact.[5]

Accordingly, based on the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that:
1. defendants' motions for summary judgment are granted; and
2. plaintiffs' motions for summary judgment are denied.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**4.** Bingo is subject to numerous variations. The fact that some bingo games appear not to meet the statutory requirements raises the question of whether they are bingo within the meaning of the statute. That question, however, is irrelevant to whether keno is a game similar to bingo, as defined in the IGRA.

**5.** The Lower Sioux Community argues that as played at Jackpot Junction, keno is not a house

banking game, because if no one wins a given game, all players win the right to play again for free. Where no one loses, they argue, the house cannot win, and the game is not a house banking game. Because the Court has concluded that keno is not similar to bingo, it need not address whether Jackpot Junction's version of keno is a house banking game.